## Weir *vs* Weir's Administrator, &c.

APPEAL FROM THE FAYETTE CIRCUIT.

*Executors and Administrators. Trustees. Interest. Assumpsit for work and labor.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

THIS is an appeal from a decree rendered on a bill filed by Eliza Jane Weir, an infant, by H. Clay, her guardian, against the surviving administrator of the estate of her

CHANCERY.

*Case 157.*

*April 25.*

Case stated and questions for revision.

deceased grand-uncle, James Weir, deceased, for her share of the distributable surplus of his personal estate.

.Two questions only need be determined in this case: 1st. Is the administrator liable for interest upon the funds which came to his hands. 2d. Is the young Weirs, the nephews of the decedent, entitled to compensation for services rendered for their uncle in his lifetime.

1st. It seems that the administrators took possession of the factories, mills, shops and manufactured and raw materials on hand, at valuation, and carried on the same in their own name, and for their own benefit, using the slaves of the decedent, and no doubt the cash funds and outstanding debts. The administrators had no funds of their own; and as a very large amount of funds, in money, must have been necessary to keep up a supply of the raw material, pay hands, and support and keep in operation the various expensive establishments, it may be presumed that the cash funds on hand, as well as those that were collected, were used and employed in carrying on the business, as it is admitted that the whole of the personal estate or *chose* in possession, including slaves, was so used and employed. Nor is it denied that the cash funds were so used and employed, or pretended that they were set apart or kept on hand for the distributees as they might apply for the same. That those establishments yielded a profit, and most probably a handsome profit, may also be reasonably presumed from the fact that the administrators, during their joint lives, and the survivor after the death of one of them, continued to carry on the business, and also, from the fact, that though called on to exhibit an account of the profits, which are charged to have been large, he has failed to do so, or to exhibit an account of the establishment, so as to enable the Court to determine whether large profits have or have not been made. Under these circumstances it is certainly proper to allow interest at least. Indeed, our only doubt is, whether we should not send the case back and require an account to be taken of the whole profits of the estab. lishments, and if profits were made, to decree a division thereof, as well as of the personal funds. It is certainly a general rule, that if a trustee or fiduciary employ the

funds of the *cestui que trust* in speculation or trade, or in carrying on his own business, or in a commercial adventure, that if profits are made, he is liable and may be made to account for the same, and if loss happens, he may be made to bear it: (*Leven on Trusts*, 289–90, 24 *Law Library*, 147.)   But upon consideration of the difficulties, embarrassments and delay to which the infant might be subjected, in coercing a full and complete settlement of the accounts, we have concluded to allow interest in lieu thereof; as probably under all the circumstances, equally advantageous to the infant, and of which the administrator, who might be made to account for the whole profits, can have no just ground to complain.   But as a large portion of the outstanding debts may not have been collected short of twelve months from the time administration was taken, and as, if the personal property had been sold, it most likely would have been sold on a credit of twelve months, we think that the interest should commence running only from twelve months after the time administration was granted.

2nd.  We have had more difficulty upon the second question, that is, whether the nephews should be entitled to any compensation for their services.   Their uncle, the decedent, was an Irishmen, who had emigrated to this country at an early day, and had amassed a handsome fortune in land and slaves, and houses and town lots in Lexington, and lived and died a batchelor.   The three nephews were young Irishmen, who amigrated to this country some years before the death of their uncle, without property or means, and were taken into his employ, fed, clothed, and decently supported by him.   They, in the mean time, were actively and industriously engaged in assisting him in carrying on his multifarious and complicated business, and rendered essential and valuable services in their several stations, one of them, for some twenty years before his death, the other two for some six or eight years.   No contract for hire or stipulation for wages appears ; nor is it shown, by the slightest evidence, that they looked for or expected compensation in the form of wages or salaries.   Though they had brothers and sisters and cousins in Ireland, who were as nearly

WEIR
*vs*
WEIR'S AD'R &c.

——Commencing in this cause under its particular circumstances, 12 months from the qualification of the adm'r.

There is no *implied* assumpsit to pay for work and labor, *where the conduct, situation and mutual* relation of the parties does not show that it would be just.

WEIR
vs
WEIR'S AD'R &c.

allied to their uncle as themselves, and who are entitled to come in with them for an equal division of his personal estate, the three nephews, having arrived here in time before his death to inherit from their uncle, and the infant complainant, who was born in the United States, and is the daughter of their deceased brother, are entitled, by descent, according to the laws of this State, to the whole of his ample real estate, including slaves, each inheriting one fourth, which amounts to near fifteen thousand dollars in value to each. In addition to which, each of them are entitled to an equal share, with each of the foreign distributees, in the distribution of the personal estate. It is to be presumed that they knew well what the law of descents was in this State. Their interest would have prompted them to make inquiry on this subject. And being apprised that, in case of the death of their uncle, each of them would inherit one-fourth of his large real estate and slaves, as well as a share of his personal estate, may it not be well presumed that they labored in his service and looked to the estate which would be cast upon them, as their compensation, and to no other; and if so, may it not be well doubted, whether, in equity and good conscience, they are entitled to any other or further compensation, and the more especially as they have received, by descent, including their distributable share in the personalty, a much larger amount than they would be entitled to receive as compensation for services, according to any just estimate that might be made of their services.

It is not pretended in this case, that any express contract for services was ever made. If a right to an allowance for services exists, it must rest only on an *implied* contract or promise to pay. It is said by one learned jurist, "that an implied contract or promise is inferred from the *conduct*, *situation* or *mutual relations* of the parties, and is enforced by the law on the ground of JUSTICE." And this language is used by Chief Justice Marshall, in 12 *Wheaton*, 341, "a great mass of human transactions depends upon implied contracts; upon contracts which are not written, but which grow out of the acts of the parties. In such cases, the parties are *supposed* to have *made* those *stipulations* which, as *honest,*

The defendants, young men and foreigners, came to the U. S. without means, and entered into the employ and business of their uncle, a wealthy old batchelor, without any contract for compensation, and so continued until his death, and inherited, by descent, his real & a part of his personal estate, greatly exceed-

*fair and just men, they ought to have made."* And Lord
Mansfield says, that when *ex equo* and *bono* money is
due, though there be no express promise to pay, that the
law will *imply* a promise.   Testing the defendant's claim
for compensation by the rules and principles just cited,
and it is hard to perceive any just ground upon which
they can be made to 1est.   From the conduct, situation
and mutual relations of the parties, so far from its being
founded in *justice*, to allow compensation, it would ope-
rate the height of *injustice;* and so far from the stipu-
lations for payment, which is sought to be implied, being
such as *honest, fair* and *just* men *ought* to *have made*,
they are precisely such as *honest, fair* and *just* men, un-
der the circumstances of this case, would not have thought
of exacting on the one side, or have thought of making
on the other.   And, *ex equo et bono*, surely nothing moie
should be exacted than the amount which has been ob-
tained by descent.

Should their claim be allowed, as set up, they would
first obtain by inheritance three-fourths of the real estate
and slaves, and then exhaust, by their claim, the whole
of the peisonal estate, amounting to some forty thousand
dollars, and thereby cut off the foreign distributees, who
are as nearly allied to the decedent as themselves, from
the receipt of a single dollar.   Such a result cannot be
equitable, nor can it be believed that it was ever contem-
plated by the decedent, or his nephews, in his lifetime.
Indeed there is strong ground to believe that this claim
was an after-thought, concocted and brought to maturity
by the defendants after the infant's suit was instituted.
We never hear of it, at least, until it is set up in the an-
swer of the administrator, filed in May, 1837, more than
five years after the death of their uncle, though a bill was
filed by them for a division of the lands and slaves as
early as February, 1833 ; and a settlement seems to have
been made by the administrator with the County Court
in 1835.   Nor does it appear, even down to the final de-
cree in this cause in 1840, that the administrator had ev-
er paid to his brother George the amount which he sets
up for him for services, or that George ever made de-
mand of it from him or set up any claim for the same.

VOL. III.                    82

WEIR
*vs*
WEIR'S AD'R &c.

ing a reasonable
compensation—
held that no con-
tract for com-
pensation is im-
plied, but the re-
verse.

And though George is a defendant to the suit he has not answered or set up any claim. The surviving administrator, James Weir, sets up the demands for all, claiming in his own right, his own demand, and also the demand of his brother Henry, by devise from him, he having died shortly after his uncle.

It has been determined that where a testator was owing an acknowledged debt, in his lifetime, and bequeathed to his creditor a legacy, *simpliciter*, of the same nature of the debt, and of equal or greater amount than the debt, subject to certain designated exceptions, the legacy will be deemed a satisfaction of the debt: *Brown* vs *Dawson*, (*Prec. Chan.* 240;) *Fowler* vs *Fowler*, (3 *P. Will.* 353 ; 1 *Ves. Sen.* 123, 125 ; 2 *P. Will.* 130 ; *Prec. Chan.* 394.)

*A legacy to a creditor, equal to the amount of an existing debt, is sometimes considered in satisfaction thereof.*

But it is evident in this case that there was no subsisting obligation for a debt in favor of either of the nephews, or express stipulation for compensation in money or wages. The proof in fact repells such an idea. If any implication in favor of remuneration can be raised, from the *conduct, situation* and *mutual relations* of the parties, as *honest, fair* and *just* men, the implication would be that their uncle would, either in his lifetime or at his death, advance them out of his ample fortune an amount equivalent or more than equivalent to the amount of their compensation, and that they looked to and relied upon this expected advancement for their compensation and not to wages, for their services, or a remuneration in money. If so, they have, by operation of law, obtained an advancement more than equivalent to their services, and equity will not imply a promise to pay more.

*Provisions by will in favor of those for whom a testator is under obligation to provide portions, sometimes considered in satisfaction of such obligation.*

It has been settled as a well established rule in equity, that when a parent is under *express obligation*, by articles, to provide portions for his children, and afterwards, by will or codicil, makes a provision for those children, that such testamentary provision shall be considered a satisfaction or performance of the obligation. And so much opposed are Courts of Equity to raising *double portions*, that if the amount bequeathed shall be *less* than the amount agreed to be advanced, the sum so bequeathed will sometimes be considered as part satisfaction: *Brown* vs *Brown*, (2 *Vern.* 439;) *Blois* vs *Blois*, (2

*Chan. Rep.* 347;) *Moulson* vs *Moulson*, (1 *Brown's C. C.* 82;) *Copely* vs *Copely*, (1 *P. Will.* 147;) *Ackworth* vs *Ackworth*, (1 *Bro. C. C.* 307, *note;*) *Boyd* vs *Boyd*, (*Same*, 308, *note; same* 309, *note;*) *Warren* vs *Warren*, (*Same*, 305;) *Finch* vs *Finch*, (1 *Ves. Jun.* 534;) and various cases referred to and commented on in 2 *Roper on Legacies, chapter XVIII.*

So, where an *express obligation* to provide portions or make an advancement or other provision is subsisting, the *devolution* of a distributive *share* of *personalty*, or *the descent of real estate* from the person under obligation to make the provision upon the individual for whom it was provided, has been decreed to be a performance: *Lee* vs *Dawanda*, (3 *Atk.* 419;) *Blandy* vs *Wilmore*, (1 *P. Will.* 323;) *Garthshon* vs *Carlie*, (10 *Ves.* 1;) *Goldsmid* vs *Goldsmid*, (1 *Swan.* 211;) *Wilcocks* vs *Wilcocks*, (2 *Ver.* 558.)

If, where there is an *express obligation* to provide portions or make advancements, a testamentary provision or devolution of personalty, or the descent of realty, may be presumed and treated as satisfaction or performance, much more when, as in the case under consideration, from the conduct, condition and relations of the parties, it is rendered doubtful whether any implication for compensation can be raised, and if any, it must be regarded as an implication to make provision for them out of his estate, and they looked to that as their expected remuneration and no other; will the descent of realty and slaves, and the devolution of personalty, to a much larger amount than any of the other heirs, save the infant, and much larger than any pecuniary compensation that they might be entitled to for services, be regarded as a full performance or satisfaction of their expected remuneration? And a Court of Equity ought not and will not imply a promise to pay more. They have received, by *operation of law*, what they looked for, and more than they had any just right to expect, and it would be unjust to the other heirs to decree them more.

Decree reversed and cause remanded, that an estimate may be made of the interest, from twelve months after administration granted, up to the final decree, adopting

<div style="margin-left:2em">
WEIR
*vs*
WEIR'S AD'R &c.
</div>

the mode of calculation heretofore pursued by the Commissioner, only changing the time when the interest is to commence running, as herein directed, and that a decree may be rendered in favor of the infant complainant for her share of the aggregate amount, so found due and unpaid, disregarding the claim for compensation for services; a refunding bond being first required, if it has not been given; and the appellant is entitled to her costs in this Court.

*Harlan & Craddock* for appellant: *Woolley* for appellee·

*May* 17.

### PETITION FOR RE-HEARING,
#### By Mr. Woolley.

The counsel for the defendant, James Weir, respectfully asks the Court to grant a re-argument of this cause, for the following reasons: There are parts of the opinion given, (and which will in this petition be specified,) which, as he thinks, does great injustice to the character of the defendant, James Weir. Strong language is used by the Court, reflecting upon his conduct as morally dishonest, when it clearly appears from the record, that he has acted with a scrupulous regard to the interest of all the persons interested in the distribution of his deceased uncle's estate, and more especially to the complainant herself. A small portion of the history of the judicial proceedings, out of which the present controversy has sprung, is necessary, that the truth of this remark may be manifest. Upon the death of James Weir, Sr. a large estate of realty, personalty and slaves was left for division and distribution. The distributees of the personal estate were very numerous, the greater portion of them in Ireland, and not the same as the heirs of the slaves and realty. Difficulties were presented at once upon the division of the slaves and real estate. One of them was an infant niece, in a foreign country. Her relations, under whose care and control she had thus far been reared and educated, were unfriendly to the defendant and his relations; it was matter of great delicacy with him how to proceed to escape complaint and censure, and perform his duty to-

wards the only child of a deceased brother, to whom he had been sincerely attached. By the advice of counsel he filed the bill referred to in the record, for a division of the slaves and real estate, with a prayer that the Court would take her interests under its protection, making her a ward in Chancery, and appoint some discreet and responsible person her guardian. The Court was willing to appoint him, but he declined, stating the unfriendly feelings existing with the complainant's family and his own relations in Ireland, but recommended Mr. John Love, a man universally known as an honest, judicious and responsible man, who was appointed. He accepted the trust, and up to his removal, by the interference of those suspicious, complaining and intermedling relations, performed the same with scrupulous fidelity. A division took place under such men as Benjamin Gratz, Matthew T. Scott, William A. Leavy and Richard Higgins, as Commissioners, with a charge from the Court to have a strict regard for the interests of the infant heir. When Mr. Love was removed, Mr. Clay, the new guardian, objected to the division, because too few slaves were assigned to his ward, and for other reasons, which he afterwards abandoned, upon an exchange of a lot for some few additional slaves. Thus far it is apparent that James Weir has been actuated by honest and affectionate considerations towards the complainant, not the dishonest and selfish motives charged in the record, and to some extent sanctioned by the opinion of the Court. It will be perceived that the distribution of the personal estate is not yet brought into the controversy. Pending the above, Mr. Clay files a bill for distribution, in the name of the complainant alone, disregarding the other distributees in Ireland, who were sixteen in number. No complaint is heard or whispered from any other quarter up to that time or since. Now begins the first contest upon matters upon which this suit is founded, and is confined to the complainant and defendant alone, all others are satisfied they had been fully paid their shares, given their receipts in full for the same, as is manifest from the defendant's answer. It is true the releases are not in the record, but they are offered as exhibits, and there can be no doubt in the mind of any one

who reads the record, that they existed as alledged. The opinion of the Court upon the cause, the history of which has thus far been presented, will now be more particularly noticed. There are but two questions, says the Court, necessary to be decided: 1st. Should the defendant be charged with interest; and 2nd. Is he to be allowed any thing for his own and the services of his two deceased brothers, Henry and George. Upon the question of interest the Court, in their opinion, after speaking of the administrators taking possession of the factories, slaves, personal property and cash funds on hand, use this language: "They carried on the same in their own names and for their own benefit, using the slaves of the decedent, *and no doubt cash funds, &c.* The administrators had no funds of their own, and as a large amount of money must have been necessary to keep up a supply of the raw material, pay hands and support and keep, &c. it may be presumed that the cash funds on hand, as well as those that were collected, were used, &c.; nor is it denied that the cash funds were so used and employed, or pretended that they were set apart or kept on hands for the distributees." It appears from the Commissioner's report, that a little over three thousand dollars was the amount of the cash funds on hand at the decedent's death. The balance, the Court say, may be presumed, did not come to their hands in less than twelve months. What was to be done? A large number of slaves, a stock of raw material on hand were to be disposed of in some manner. Three of the heirs are here—young men accustomed to business; the fourth, an infant niece, is in a foreign country. If a division could then take place, they desired it, and wished to go on with the same business they had been used to. They had no right to make the infant a partner; her interest could not, for some time, be set apart, so that they could go on. No better mode could have been adopted than to work the slaves altogether; become responsible to her for the value of the hire of her slaves, when the same should be ascertained by a division; work up the raw material, and pay her the value of her share of it. It appears to the counsel that there was nothing improper in this, if it was done in good

faith, and that it was so done, and with the honest inten-
tion of doing to her such justice as should be in accord-
ance with her legal, equitable and just rights, there cannot
be a shadow of doubt.　They have always been ready to
account to all, justly, to the full extent of the value of every
thing used by them, and have so done and paid to all but
the complainant, and would have paid her long ago if she,
or those who superintended her rights, would have receiv-
ed what was only her just due.

The personal estate was to be collected and distribu-
ted among twenty, sixteen of whom resided in Ireland.
At what period the distribution commenced does not
appear from the record.　In 1837, the defendant files his
answer, and in that states he has paid all, except the com-
plainant, their full share; that he has their receipt in full;
offers them as exhibits to his answer; suggests they are
necassary parties; that the complainant be compelled to
make them so, and for them, when made, to answer if the
receipts are not genuine.　It may be presumed that the
payments were made as soon as the funds came to hand,
or a short time after.　They all knew of the death of the
decedent; that he left considerable property, and that they
were entitled to a portion.　We find the death of James
Weir, Sr. to have taken place in 1832.　Eearly in 1833,
(February 19th,) a bill is filed for a division; the decree
is given 24th April, and the same takes place in July
following.

The guardian is put in possession of his ward's estate.
The amount then in the hands of the administrator, ac-
cording to the settlement before the Court, made some
time previous, is paid over to the guardian.　From what
source the sum of sixteen hundred dollars sprung does
not appear; whether from the personal estate, or the
proceeds of the hire of her slaves and rents.　It is proba-
ble the latter.　It was, however, promptly paid the in-
stant a person was appointed authorized to receive it.
Now, in about twelve months, the administrator of this
large and complicated estate, renders an accurate inven-
tory and appraisement to the County Court; settles with
them; files a bill in Chancery; obtains a division of the
real estate and slaves; has all the necessary conveyances

WEIR
vs
WEIR's Ad'r &c.

executed; a very discreet, responsible and just man ap·
pointed guardian, and put into full possession of the es-
tate of his infant niece, and pays him the amount of mon-
ey in his hands to an excess of $750, which is afterwards
refunded to him. This does not certainly appear like
the conduct of one who is anxious to procrastinate in the
performance of his duties, and use the property of others
without right and just compensation Now, I maintain,
that at this time it is a reasonable presumption, from the
course of conduct of the defendant, as shown by the
above facts and others, that the distributees in Ireland
(excepting the complainant,) had been fully paid their
shares, independent of every charge by the three brothers
for their services. The payments are made before 1837,
and the receipts executed; the amount for their services
had not been ascertained or liquidated—that did not
take place until 1841. The fund, therefore, distribu-
ted among all but the complainant must have been undi-
minished by the charge for services. The amount then
remaining for distribution, in the period of not much
more than twelve months after the decedent's death,
could not have been more than sufficient to pay the two
brothers in this country their shares, and the complain-
ant hers. Now, it appears in the record that there was
hanging over the estate, claims to the amount of more
than twenty thousand dollars, and they were dangerous
claims. One, the case of McKinney, was compromised,
upon the payment of the amount, one thousand dollars;
the other was defeated: but I say it threatened to make
the defendant responsible to a large amount, and at a
time when he had paid over nearly all the assets which
had come to his hands.

I refer the Court to the case of *Bartlett's executrix* vs
*Lewis Sanders and his securities*, of which James Weir,
Sr. was the only responsible one.

The administrator certainly had a right to retain for his
protection, funds adequate to meet those demands, but
he did not do so. He liberally paid to his relations their
portions, regardless of his own security. To all this the
Court may answer, all right as you have presented it,
but you used the funds and therefore you are bound to

pay interest. Where is the proof in the record that he used the funds of the complainant? None whatever, except the presumption which the Court draws from the extensive character of the business done by the decedent before his death; the cash capital required for the purpose of carrying on said business, and the poverty of the defendant at the time the estate came to his hands. He was, says the Court, destitute of funds: but after the estate came to his hands, how was his situation then? In addition to his own share, he shortly after received, by devise, the whole of his brother Henry's. He had a fair and unblemished fame, and was in high credit; a name and credit which stands to this hour without a stain, except from the opinion of this honorable Court. In the possession of some forty or fifty slaves in his own right; a valuable real estate, and yet it was necessary, in the opinion of this Court, that he should use the funds of his infant niece, amounting, at the maximum at the time the Court makes his responsibility for interest commence, to not more than $1400,(for bear in mind, that it is her and her only that complains the funds were used—none other of the distributees utter a murmer of complaint,) to carry on a bagging factory. He certainly did not retain the funds of the other distributees very long. We do not hear them complaining. Now, what amount of money of the complainant, not allowing him the charge for services, had he at the time the Court suppose he came into the possession of the whole estate, and at which they direct the interest to commence running? The twentieth part of $27,000, say $1350. I will venture to say, as a fact, that there is enough in this cause to show that there has not been a time from the period fixed by the Court up to the rendition of the decree, that the defendant has not had in hand an amount much beyond that, and there has not been one moment that he was not ready to pay the amount. I do not understand that the law requires the administrator to set apart the identical money; that he is to show a special deposit of the particular fund. He may keep one account, embracing his own and the complainant's funds, provided he has always on hands the amout ready for her. She has no right to complain

that the same has not been paid over to her. She has never yet made such a demand as the law requires to entitle her to it. No refunding bond has ever been tendered, and until lately there was great necessity for one. Why then should he be charged with interest? He never did use her money in a manner required by law to render him liable to the charge of interest. The Court, in the opinion, also say, "nor is it denied that the cash funds were so used and employed, or pretended that they were set apart or kept in hands for the distributees." The counsel desire the Court to look again into the record and read attentively the bill filed by Mr. Clay for distribution in October, 1835. This bill for the first time presents the question for distribution. The previous contest was altogether upon the division of the real estate and the slaves. It does not, directly or indirectly, charge the defendant with using the cash funds of the estate; makes no complaint whatever upon that ground. It makes various charges of sales of slaves, and that the defendant had not paid sufficient hire for the slaves of the complainant, which he had previously in his possession, by hiring, &c. from the former guardian, Mr. Love, all of which he afterwards abandoned, as will be seen in the record, and confirmed the division, with a slight change. The bill also states an important fact, tending to weaken some of the reasons set forth in the opinion of the Court, which will be noticed hereafter. As to the settlement before the County Court, which is not in the record; that the settlement only embraced the real estate and slaves, and had nothing to do with the distribution of the personalty. Upon what ground was the defendant to deny the use of the funds, &c? No charge or complaint is made. He is taken by surprize in this Court. If he had been apprized by the pleadings that he was to respond to such a charge as that, he would have admitted or denied, and if the latter, been prepared to rebut the presumptions drawn by the Court, as stated in the extract already made. Here is an administrator rendered responsible for interest, without a charge that he has done ought to make him so, or a demand for it; without any evidence to support the charge, if the same had been

made, except the presumptions that a man of large estate in slaves and realty, his own distributive share at the time, say twelve months after the death of the decedent, amounting to some three thousand dollars, would be unable to carry on a bagging factory in the city of Lexington without using the funds of others in trust in his hands. The Court have some idea, not, to be sure, very definite, that there were numerous establishments, such as factories, stores in various places, &c. The record, showing the division, informs the Court what was the estate. A cotton factory in Woodford county, with appurtenances, which was allotted to George Weir, and a bagging factory and slaves and houses and lots in the city of Lexington, which were divided between Henry, the defendant, and complainant.

One word more upon the receipts set forth in the defendant's answer, filed in 1837, and to which the Court is particularly referred for a true and faithful history of the defendant's conduct. Those receipts are in full, by the distributees in Ireland. They were not ignorant persons, to be imposed upon with a half-pay of what was due to them, but intelligent men, as is obvious from some of the correspondence set forth in the record. A full account had been furnished the County Court at that time of the whole amount of the personal estate. Some of them came over to Lexington, and knew well what they were entitled to. They received their full share. The services were not deducted out; they were not ascertained, and as has been before repeated, not a word of complaint comes from them while this controversy is pending, from 1835 up to 1842. Is this not evidence that the statement in the defendant's answer is true, and not what I am afraid the Court will say, from mere suspicion out of the record, that the defendant bought them out for a less sum? I say from suspician, out of the record, because, with respect for the Court, I am apprehensive it has been influenced, in the opinion already given, by suspicions extrinsic and not authorized by the testimony in the cause.

The second question embraced in the opinion of the Court is thus presented: "Is the young Weirs, the

nephews of the decedent, entitled to compensation for services rendered for their uncle in his life time." The counsel think that the opinion presents the claims of the nephews, and particularly the claim of the eldest, Henry Weir, deceased, in a much less favorable aspect than the record does. He will, therefore, take the liberty, in this petition, to present the facts as contained in the record, before giving his views of the law arising therefrom. The first witness, William Anderson, a very intelligent and respectable merchant, says: "I have been intimately acquainted with the late Henry Weir, and having myself been agent for James Weir, Sr. deceased, for many years, &c. I became well acquainted with the relations in which the said Henry Weir stood with his uncle, in the control and management of his business, &c. during the twenty years previous to his death. In or about the years 1817 and 1818, the estate of James Weir, Sr. deceased, was nearly reduced to insolvency, arising from the payments of large sums of money as security, &c. From that time the said Henry undertook almost the sole management of the business and affairs of his uncle, not only in the superintending his extended manufacturing business of hemp and cotton, but also in the negotiations with creditors of said James Weir, deceased, in the liquidation of the many heavy debts for which the said James Weir was bound, and I can well testify to the skill, prudence, industry and uncommon ability with which the said Henry Weir conducted the various duties which devolved upon him in said business, and I attribute, in a great degree, and principally to his efforts and entire devotion of his time and capacity, that said James Weir, Sr. deceased, was enabled to discharge his debts, and to acquire the property which the said James Weir, deceased, was possessed of at his death." Again, when asked as to the value of his services, he says, "he considered them almost invaluable to said James Weir, deceased." "He would say that the very lowest sum, as a matter of strict settlement between principal and agent, which he could put down, and which he would consider as entirely moderate, would be from twelve to fifteen hundred dollars per annum, exclusive of all his personal expenses, board,

clothing, &c. during the whole twenty years aforesaid. But for many years preceding the death of said James Weir, for from five to ten years, this deponent would estimate his services at from fifteen hundred to two thousand dollars per annum." "He devoted all his time and attention to his uncle's business, and his place could not have been filled by any one else. He was a remarkably intelligent and capable business man, and pleasant and gentlemanly in his deportment. He acquired no property of his own, not even a riding horse, up to the time of his uncle's death. He was a man of great personal economy. This deponent recollects, at one time, hearing James Weir, Sr. speak upon the subject of compensation for the services of Henry Weir, and he then said that he had in contemplation to make him a partner, by way of compensation. Deponent further states, that said Henry Weir contributed greatly to the accumulation of the estate of said James Weir, deceased, by allowing the amount to which he was entitled, upon a fair estimate for his services, to remain in the use of said James Weir, deceased. And this deponent always considered said Henry entitled to demand compensation for his services."

The next witness is E. W. Craig, who, after stating his acquaintance with James Weir, Sr. deceased, and Henry Weir, for many years preceding their deaths, in language equally strong with the previous witness, says: "He, (said Henry,) often conferred with me in relation to matters connected therewith, (meaning his uncle's affairs,) in a way which led to the conviction on my mind, which conviction I often stated to others, that the success and large profits attending, &c. were mainly and justly attributable to the talent and devotion which was given by the said Henry Weir, deceased, who appeared to have almost the entire control and management of it, and to which he appeared to devote his whole time, mind and talent, so much so that I even conceived that without his personal devotion, from the year 1817 until his uncle's death, that his place could not have been filled by any other person." "Having been called on for a statement of my opinion of the value of his services, I find it difficult to affix any value on those services, and considering

the extensive business he conducted, and large profits, &c. would deem fifteen hundred or even two thousand dollars below its intrinsic importance, from the year 1817 until his death in 1832, that is to say, the above sums per annum." Again, in answer to the following question: "During the several years of the time whilst Henry Weir was in the service of his uncle, was or not James Weir, Sr. very much embarrassed, and considered insolvent, and was not Henry Weir compelled to make great sacrifices of feeling, interest and credit, in the management of the business of James Weir, deceased?" "I answer emphatically in the affirmative, to all those questions, because Henry Weir involved his own goods, which he had purchased in Philadelphia, intending to engage in business in his own name, in the business of his uncle, and applied them to the discharge of the debts of said James Weir, deceased, and thus deprived himself of the means of paying for said goods, which he had purchased on his own credit, and owing to the great embarrassment of his uncle's affairs, the difficulty in meeting his own engagements for said goods, which caused him great mortification of feeling, &c. Henry Weir was a man admirably qualified to manage business as a merchant, and *I doubt not that he could have advanced his own private* fortune by conducting business for himself more than even by the allowance or estimate I have made above."

I have made the above extracts that the character of the services of Henry Weir may appear through the testimony of the witnesses, and not through the language of the Court, or even upon any language I could use to present it. There are depositions further strengthening what is said above, and also showing that James Weir, Jr. the defendant, and George Weir, deceased, rendered important services also; the defendant for some nine or ten years, and George some six or seven years before the death of their uncle. The other witnesses estimate the services of the defendant at from one thousand to fifteen hundred dollars per annum, and of George at from five hundred to one thousand dollars per annum. The Court below allowed Henry Weir fifteen hundred dollars per

annum; James, the defendant, one thousand per annum, and George five hundred per annum, for five years; and it is to this claim and allowance, as above stated, that the Court use the following language: "And so far from the stipulations for payment, which is sought to be implied, being such as *honest, fair* and *just* men *ought* to have *made*, they are precisely such as *honest, fair* and *just* men, under the circumstances of this case, would not have thought of exacting on the one side, or have thought of making on the other." This is strong language, and the counsel think unjust language towards a claim founded upon facts such as detailed above. The record shows, and it is true, that the claim for compensation has been presented against no distributee but the complainant. The other distributees, in Ireland, were paid off, as before stated, before any testimony was taken or estimate made of the services. It was always the intention of the nephews, on account of their inheriting a larger portion of the estate than those who were merely entitled to a share of the personalty, to waive their claim to compensation, and they have so done, and the defendant, as shown by his answer, has paid them in full and obtained his discharge. But it was otherwise with their intentions towards the complainant; she inherited an equal amount with them, and in no manner ever contributed to make a dollar of it. There is justice and equity, without doubt, as against her in the claim, that she shall contribute, out of her distributive share, a small amount towards the compensation of those, without whose services, as clearly shown by the testimony, she would never have received a dollar; for I think it is clearly established, that but for Henry Weir's ability and entire devotion, the uncle, of the complainant would have died insolvent. From his services and the other two nephews, she is enriched to the amount of from fifteen to twenty thousand dollars, and the Court, upon this say, that it is unjust and dishonest to abate her distributive share the small amount of some seven or eight hundred dollars, the only compensation for all the above invaluable services.

Some persons might have a very short way of their own to answer the above statement, and the testimony as

WEIR
vs
WEIR'S AD'R &c.

literally detailed; for instance, "these were poor Irish boys, who came over to see a rich uncle and get his estate, or that they were sent for by their uncle to come over and he would support them;" (and, notwithstanding the opinion expressed by the witnesses,) "yet they were not worth much more than their victuals and clothes;" and if asked for the evidence, they would answer, "why we know how men will express their opinion, &c.: but we know, (for our opinions and experience and superior knowledge are better than theirs,) that their services were not worth more than their support. At any rate it is absurd to say that the services of a man like Henry Weir, for twenty-one years, could have been worth fifteen hundred dollars a year." And all this in the face of the opinions of conscientious and intelligent witnesses, one of whom, Mr. E. W. Craig, (who has accumulated a large fortune by industry, honesty and prudence,) says on his oath, "that such was the uncommon ability, industry and devotion of Henry Weir, that he is satisfied he could have acquired more by attending to his own business than the estimate made, which would have been more than his whole share of the decedent's estate. But this is not the language for a Court of Justice to use; its decisions should be founded upon the evidence and not upon conjectures. For what use does a litigant present the testimony of credible and experienced men, if they are to be disregarded as of no weight against the opinions of the Judge, which opinions may be the effect of some unfounded prejudice or whim which has come over his mind, from a hasty and imperfect view of the case. These remarks are not made because the opinion of the Court calls for them, or because the counsel suppose that this honorable Court will be under the erroneous influences above suggested, but because he has known opinions similar to those above expressed, formed in such manner by very upright and sensible Judges.

Thus far the case is presented upon just and equitable grounds, in opposition to the incorrect and unjust manner in which, as I think, the opinion of the Court presents the case. The legal merits of the opinion next claim attention. The Court seem to feel the great diffi-

culty of considering the value of the services as a debt due from the estate, and therefore endeavors to make it out that there was no assumpsit, either express or implied, to bind the estate, after the death of the decedent. If an express promise had been made by the decedent, in writing or by parol, to pay the nephews whatever the services was worth, the devolution of a portion of the estate by descent, upon them, would not have paid the debt. And so I understand the Court. But if incorrect in this, let the principle be more definitely asserted in the response to the petition, that there may be no mistake, that the Court of Appeals have settled it as law, that property coming by descent or distribution, pays the heir or distributee, as far as it will go, any claim or debt which the estate may owe him. I do not, as I before said, understand the Court to go thus far; and hence the effort in the opinion to discard any assumpsit whatever. There can be no difference, so far as the obligation to pay, between an express and implied promise. The implied creates a debt. The action of *indebitatus assumpsit* is founded upon a debt due, and debt can be brought wherever the other can. Was there an implied promise on the part of the decedent to pay for the services rendered? If the defendant and his two brothers had have been others than relations, they certainly could have held James Weir, Sr. bound for the value of their services, and also his estate after his death. The Court seem, however, at once, and in a very short and easy mode, to obviate this, by merely asserting that they were his nephews, and poor Irishmen, and therefore they were presumed to have worked for him for no other promise than to receive their support and look to his estate after his death for compensation. If James Weir, Sr. had been a married man, with children, there could have been no expectation of payment by the devolution of his estate upon his death, and hence the Court lay some stress upon the fact of his being an old batchelor, and that fact, and that they were his nephews, and by the laws of the country enabled to inherit, when the other numerous persons in Ireland, standing in the same relation, were excluded from taking by descent, excludes every presumption of a promise or

VOL. III. 84

liability to pay. Now there were many contingencies that might have changed at once their prospects for compensation. Marriage; change of the estate from slaves and realty, to personalty, (which would have brought all the others in equally;) their not surviving the decedent; the other relatives coming over and being naturalized, &c. and many others that can be mentioned. Henry Weir had labored twenty-one years in his service before his decease, which was a few months after the death of his uncle, and in that time, according to the testimony, could have, by the devotion of his time and capacity to his own business, acquired an estate much larger than his portion, which he received by descent. Suppose that he had deceased before his uncle, could not his administrator have maintained an action for the amount that his services entitled him to. Or suppose that from any cause, his uncle and himself had disagreed and separated, could he not have demanded a settlement, and compelled payment of what was due to him. Or suppose James Weir, Sr. now living, and a defendant in a suit of Henry Weir against him, and the proof in the record the same precisely as in this, what would be the judgment of this Court? That there was no promise, express or implied, on the part of James Weir, Sr. to pay him beyond the support which he had received, or that he was entitled to that compensation which the testimony in the cause proves was just. But all this is changed by the death of the uncle happening first. A claim for a debt, in a legal sense, existed before his death, and how has it been discharged? In no other way except by the devolution of a portion upon him, and that in favor of one who received as large a portion and never contributed one dollar towards the acquisition of the estate. The Court must, therefore, make out the position, (for upon no other can the opinion stand,) that there never was, before the death of James Weir, Sr. an obligation on his part to pay Henry Weir one dollar beyond his support for his services. Is this upon the principle of "*ex equo et bono*," that the value of his services entitled him to no more? This would be in direct opposition to the whole testimony in the cause. "*Ex equo et bono*" will, therefore, not decide

the question in that way.   It can only be upon an under-standing that the services were to be rendered for the support, and the prospects of the estate coming by devise, distribution or descent, (and it is very fortunate for the complainant that it did not come by devise.)   Now this must have been by contract express.   The law does not imply such.   It implies a promise to pay the value of labor after the same is rendered, in money, and not in property and upon contingencies.   Is there any evidence in the cause proving a contract of this kind?   None but the facts already stated, upon which the Court presumed such a contract.   Now it is in proof in this cause, that Henry Weir, at one time, had determined to leave his uncle's employ and commence business for himself; that he had purchased a stock of goods in Philadelphia for that purpose; that his uncle's embarrassments were such that he abandoned that intention, appropriated the goods to the liquidation of his uncle's debts, distroyed his own credit by it, and which caused him great distress and mortification.   It is also proven by Mr. Anderson, that James Weir, Sr. spoke to him of making compensation to Henry Weir for his services, and said that he intended to make him his partner.   All this goes to repel the presumption of any express contract.   Who is the party that is opposing this claim for compensation?   One who was born after the estate had been made, principally by the industry of Henry Weir; who was an infant in a foreign country; who never contributed any thing towards it, and who receives an equal amount.   Is this *"ex equo et bono?"*   The Court appear astounded at the presentation of such a claim, and denounce it in terms of severe censure.   They look to the amount reported by the Commissioner, provided the whole time should be allowed.   The defendant never expected that amount, or claimed it.   He claims the amount which the laws of the land entitle him to, as against the complainant, and no other distributee.   It is legal against all, and both legal and equitable against the complainant.   As to her, it is strictly, emphatically, honestly, scrupulously and punctitiously *"ex equo et bono."*   The counsel will not extend this petition by noticing the authorities referred to be the Court,

showing the satisfaction of debts by legacies, or of cove-
nants to provide portions out of the covenantor's estate,
upon considerations of marriage, previous advancements
or settlements, by the devolution of amounts adequate to
the portion to be advanced. They are all inapplicable,
and I feel confident the Court, upon more mature reflec-
tion, will so determine, and if the decision already given,
is according to legal principles and adjudged cases, others
must be found and referred to than those contained in the
opinion which has been delivered in this case.

All of which is respectfully submitted for the consid-
eration of the Court.

A. K. WOOLLEY, *Counsel for the defendant.*

### REPLICATION TO THE FOREGOING PETITION,
#### By Harlan & Craddock.

JAMES WEIR, Sr. died in February, 1832. Within one
month thereafter upwards of fifty thousand dollars of his
estate, consisting of ready money, bills of exchange, mon-
eys in the hands of commission merchants, hemp in the
factory, and bagging and bale rope in Louisville, came to
the hands of the defendant, as administrator. The hemp
and bagging were taken by him at the appraisement, and
he admits he is chargeable with that amount, as of the
1st of March, 1832, and before the end of that year, the
sum amounted to $57,135 46. From 1832 to 1836, in-
clusive, the defendant disbursed $27,755 34, leaving a
balance of $29,380 12. This latter sum, according to
the proof in the record, has remained in his hands to the
present time. He *may* have paid some portion of it to
the legatees in Ireland, but there is no *evidence* of such
payments.

The defendant was allowed a commission of five per
centum, amounting to $2856 77, besides reasonable ex-
penses, as a compensation for administering the estate,
which the opinion delivered in this case does not disturb.

For the use of the large balance remaining in the hands
of the administrator for ten years, his counsel insists that
no interest should be charged.

It is not pretended that the money was deposited in bank, or kept as a separate and distinct fund for disbursement: but on the contrary, the administrator, in his answer, admits that the funds were employed by him in his business; and, as we think, was probably the capital from which the large fortune which his counsel intimates, in the petition, the defendant now possesses. That the profits realized exceeded simple interest on the sum invested the record in this case very clearly shows. We do not think that the defendant has any reasonable pretext for complaint on that branch of the case. The doctrine is now well settled, that where a trustee, executor or administrator employs the trust fund for the purposes of his own business, he must account to the *cestui que trust* for the profits. "So an attorney, guardian, or other person invested with a fiduciary character, must account for all profits to the client, or infant, or other party whose confidence he has abused:" (*Lewin on Trusts and Trustees,* 289.)

A trustee, in the possession of land, is required to account to the *cestui que trust,* not only for the rents and profits actually received, but also for the rents and profits which might have been received: (1 *Paige,* 188; 2 *American Chancery Digest,* 589.)

The counsel for the defendant says, in the petition, that the reason why the money was withheld is, that he (defendant,) did not know to whom to pay it. We will answer that excuse in the language of Chancellor Kent, in *Dunscomb* vs *Dunscomb,* (1 *Johnson's Ch. R.* 510:) "If they (the executors) had met with any *real doubt or difficulty,* as to the person authorized to receive, they could have applied to the Court for advice, or brought the money into Court. If the money, (as we are at liberty to suppose,) has been mingled with their own moneys, it has answered the purpose of credit, and the rule is settled, that executors, and all other trustees, are chargeable with *interest,* if they have *made use of the money themselves,* or have been negligent, either in not paying the money over, or in not investing it, or loaning it, so as to render it productive."

WEIR
vs
WEIR'S AD'R &c.

In *Manning* vs *the executors of Manning*, (1 *John-son's Ch. R.* 527,) the Court say, "executors or trustees are chargeable with interest on trust moneys applied to their own use"—"so if they have *mingled it with their own:*" (6 *John. Ch. R.* 17;) *Clarkson* vs *De Peyster*, (1 *Hopkins*, 424.)

In *Brown* vs *Rickets*, (4 *John. Ch. R.* 305,) Chancellor Kent says: "It is the established doctrine of the Court, that an executor, or other trustee, cannot be permitted to convert trust funds to his own use without being responsible for the profits of the money. He is not to make any gain to himself from the use of the funds, but it must all be accounted for to the *cestui que trust*. So, if an executor, or other trustee, mingles the trust moneys with his own, so as to answer the purpose of credit, or if he puts the money in jeopardy, by involving it in the risk of his trade, he must answer for what it may reasonably be supposed to have made—whatever interest the trustee made ought to be paid. Though it should even be proper to keep the money in deposit, yet if he did in fact make interest of it, he ought to pay it. He must not, in any event, be gainer by his employment of the trust fund."

All the foregoing principles have been recognized by various decisions of this Court, and are well established by the custom and practice throughout the State.

The second question presented is: Are the young Weirs entitled to compensation for their services to their uncle during his lifetime?

We think the facts fairly deducible from the record, authorize the conclusion, that when these young men emigrated from Ireland to this State and took up their residence with their uncle, they were wholly distitute of fortune, education or capacity for business; that their uncle educated and made them business men; that the idea of presenting a pecuniary claim for their services never entered into the contemplation of either party; and that the enormous demand of *thirty-four thousand eight hundred dollars*, claimed for the *first time* in the answer of the defendant, filed in May, 1837, for the services of the young Weirs, was an *after-thought*, conceived by

the defendant to exhaust the large balance of money remaining in his hands.

The real estate and slaves were valued at $58,015, of which Gerge, Henry and James Weir received $43,515 ; and the defendant, through his counsel, modestly asks this Court to give him $29,380 12, the balance of the money, with ten years interest thereon, amounting in the aggregate to about $47,000, in satisfaction of a stale and fictitious claim, founded upon no contract, express or implied, and not sanctioned by any principle of either justice or equity.

The counsel for the defendant has referred to and relied upon many facts and circumstances not contained in the record. It is not intended by us to notice and point them out in this brief replication to the elaborate petition. They will be apparent to the Court upon reading the petition and comparing it with the record.

We hope the opinion delivered will remain unaltered.

<div style="text-align:right">HARLAN & CRADDOCK,<br>
*Counsel for Eliza Jane Weir.*</div>

<div style="text-align:center">RESPONSE,</div>

<div style="text-align:right">*June* 10.</div>

<div style="text-align:center">By Chief Justice Ewing.</div>

WE have examined the labored petition for a re-hearing, presented by the counsel for the appellants, also the response made by the counsel for the appellant, and so far from being shaken we are confirmed in the correctness of the opinion delivered. But that opinion was founded upon the facts exhibited in the record, and reasonable presumptions fairly deducible from the facts appearing. We have not had the benefit of the private information of the counsel, nor are we authorized to base our opinion upon such extraneous matter, nor to take for granted matters in avoidance, alledged in the answers of the administrator, without vouchers or proof. He exhibits no vouchers or proof as to the payments made to the legatees in Ireland, or when they were paid, or whether they were paid without a claim or deduction for services or not. And if no such claim or deduction was in fact made, as is now alledged by his counsel, it confirms us in the conclusion

to which we before arrived, that this claim for compensation was an *after-thought*, concocted and brought forward for the first time, in his answer of 1837, as the means of swallowing up the just share in the personalty of the infant *orphan* daughter of a *deceased brother*. If the administrator had regarded the claim as a *legal one*, and such as he had a *right* in *good conscience* to exact, it is scarcely to be believed, from the resistance which he has made to the just claims of an *orphan* niece, which is shown in this record, that he would have made payment to the foreign legatees without deducting for the same. We dare say that he has not divided among them, or *waived his claim* to any portion of the large estate descended to him from his uncle, and to which he derived an unquestionable *legal right*. But if the claim for services was *just* and *legal*, and deemed to be so by him, what right had he, as the administrator, to *waive* the claim of George, or that of his deceased brother, Henry? The evidence in this record does not show that either Henry, in his lifetime, or George, ever set up any claim to compensation for services, though Henry lived some eighteen months after the death of his uncle, and administered on his estate, and joined in the bill for the division of the real estate and slaves before his death; nor has George, though made defendant to the suit, set up any claim, nor does the administrator pretend that he ever paid a dollar to either of them on that account, or that he credited himself with theirs or his own claim in his settlement with the County Court. No claim being set up by either of them, or pretended, and no money paid to either on that account, and acting upon the idea that none was due or legally demandable on that score, he well might have made payments to the other legatees without a deduction for this newly hatched up claim.

The law implies a *contract* to make compensation for services, because it is just, right and proper, under all the circumstances of the case, to do so, and will imply a contract or promise to pay money, if from the circumstances, that implication is not repelled, or a presumption raised that compensation was looked to by the parties concerned, in another form. If the contract implied by law for com-

pensation in money or other estate, be defeated by one of the parties, then may the other resort to his remedy at law, and recover remuneration commensurate with his services. If, therefore, in the case before the Court, Henry Weir and his brothers looked to their share of the ample fortune of their batchelor uncle, as their expected reward, and he had married and had children, or any of the contingencies had happened which are enumerated by the counsel of the administrator, by which their prospects and expected remuneration was defeated, then could the uncle or his administrator have been made liable for a compensation in money, as he, by his act, had defeated the implied understanding, and placed the anticipated remuneration out of their reach. And we are strongly impressed with the belief, that had any of those contingencies taken place, that the nephews would either have left the service of their uncle, or exacted from him a distinct stipulation for wages. But none of the contingencies did take place; he died a batchelor and they have inherited the greater part of his estate, and should be content with it. The fact that Henry remained so long in his service without exacting any *contract* for wages, tends to confirm the conclusion that he never looked to compensation in that way; he must have been aware that any amount that had accrued more than five years before suit brought, would be barred by the statute of limitation, and it can scarcely be believed, had this mode of compensation been looked to by him, that he would have permitted so long a time to elapse without calling his uncle to a settlement, or exacting from him a distinct stipulation for compensation. If Henry Weir was active, energetic and enterprising, and possessed business qualifications, and aided his uncle in his old age to pass through the embarrassing times of 1819–20, &c. he was indebted to his uncle for those qualifications, who took him into his business when poor and dependent, and without means of his own, and gave him the qualifications which he possessed and left him a fortune at his death. Who was most indebted to the other, his uncle to him or he to his uncle? We cannot well perceive, if his uncle, with his extensive means, and all the aids and assistance which this active, well

qualified, and extraordinary young man had been able to afford, for some ten years before, could scarcely escape from the shock of those times, how he, without means or credit, except that derived from his uncle, could have expected to escape, and to build up a fortune greater than that derived from his uncle by descent.

We still think the authorities referred to in the opinion, and especially the latter, have a strong bearing on this case, notwithstanding they have been so unceremoniously passed over by the counsel. Had the principles discussed and settled in those cases no bearing on this, we would have preferred that the ingenious counsel should have devoted a portion of the argument of his petition to pointing out their inapplicability, or that he would have extended his researches to the production of some authority to sustain the positions which he so zealously urges, or to counteract the authorities and views of the Court.

The statement of the facts of the case, and the reference to the authorities by the counsel for the appellant, in their response to the petition, relieves us from the necessity of adding a single word on the propriety of allowing interest.

The petition for a re-hearing is overruled.